1

2

3

4

5

6

7

8

9               IN THE UNITED STATES DISTRICT COURT

10                  FOR THE DISTRICT OF OREGON

11  DOMINIC R. MARSHALL and RYAN     )
    C. CURDY,                        )
12                                   )
                     Plaintiffs,     )
13                                   )      No.  CV-07-309-HU
           v.                        )
14                                   )
    WELLS CAPITAL MANAGEMENT         )
15  INCORPORATED, a California       )
    corporation, WELLS FARGO &       )
16  COMPANY, a Delaware corpor-      )
    ation, and MARK COOPER, a        )      FINDINGS & RECOMMENDATION
17  citizen of the state of          )
    Oregon,                          )
18                                   )
                     Defendants.     )
19  ─────────────────────────────────)

20

21  Linda L. Marshall
    Attorney at Law
    PMB 408
22  3 Monroe Parkway Ste. P
    Lake Oswego, Oregon 97035
23

24         Attorney for Plaintiffs

25  Paul M. Ostroff
    LANE POWELL PC
    601 S.W. Second Avenue, Suite 2100
26  Portland, Oregon 97204-3158

27         Attorney for Defendants

28  / / /

1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiffs Dominic Marshall and Ryan Curdy bring this action against their former employer Wells Capital Management, Inc. ("WellsCap"), Wells Fargo & Company, and Mark Cooper. Defendants move to dismiss plaintiffs' first, second, third, fifth, seventh, eighth, and ninth claims for failure to state a claim.

I recommend that the motion be granted.

BACKGROUND

The facts are taken from the Complaint. Plaintiffs were employed by WellsCap until October 12, 2006. On or about November 25, 2003, Wells Fargo granted Marshall an option to purchase 15,340 shares of Wells Fargo & Company common stock. A copy of the Wells Fargo Long-Term Incentive Compensation Plan Non-Qualified Stock Option Agreement with Right to Acquire a Reload Stock Option ("Agreement"), between Wells Fargo and Marshall is attached to the Complaint as Exhibit A. The Agreement is subject to the provisions of the Wells Fargo & Company Long-Term Incentive Compensation Plan ("LTIC Plan").[1]

On or about November 25, 2003, Wells Fargo granted Curdy an option to purchase 6,140 shares of Wells Fargo common stock. The Agreement between Wells Fargo and Curdy is attached to the

---

[1] The LTIC Plan is attached to defendants' motion. Nonetheless, because plaintiffs refer to it in the Complaint, it is appropriate to consider it on a motion to dismiss. E.g., Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting the "'incorporation by reference' doctrine, which permits the court to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.") (internal quotation and brackets omitted).

2 - FINDINGS & RECOMMENDATION

1  Complaint as Exhibit B.  This Agreement is also subject to the
2  provisions of the LTIC Plan.

3      On October 12, 2006, Marshall and Curdy voluntarily resigned
4  from their employment with WellsCap, submitting letters of
5  resignation which were effective immediately.  At the time of their
6  October 12, 2006 resignation, Marshall owned 10,266, and Curdy
7  owned 4,093, fully vested stock options under the Agreements.

8      On or about November 6, 2006, Marshall and Curdy each
9  submitted a Wells Fargo Exercise of Stock Option Form completed
10 with all requested information, to exercise each of their fully
11 vested stock options.  Despite demand, WellsCap and Wells Fargo
12 denied plaintiffs' requests to exercise their fully vested stock
13 options and have informed plaintiffs that their fully vested stock
14 options have been "cancelled."

15                            STANDARDS

16     On a motion to dismiss, the court must review the sufficiency
17 of the complaint.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).
18 All allegations of material fact are taken as true and construed in
19 the light most favorable to the nonmoving party.  American Family
20 Ass'n, Inc. v. City & County of San Francisco, 277 F.3d 1114, 1120
21 (9th Cir. 2002).  However, the court need not accept conclusory
22 allegations as truthful.  Holden v Hagopian, 978 F.2d 1115, 1121
23 (9th Cir. 1992).

24                            DISCUSSION

25     Plaintiffs bring the following nine claims:  (1) violation of
26 Oregon Revised Statute § (O.R.S.) 652.610(3) against WellsCap; (2)
27 declaratory judgment to enforce O.R.S. 652.140 against WellsCap, or
28 alternatively, declaratory judgment for plaintiffs' earned and

3 - FINDINGS & RECOMMENDATION

1  unpaid wages against WellsCap; (3) penalty wages under O.R.S.
2  652.150 against WellsCap; (4) breach of contract against WellsCap;
3  (5) breach of implied covenant of good faith and fair dealing
4  against WellsCap; (6) breach of contract against Wells Fargo; (7)
5  breach of implied covenant of good faith and fair dealing against
6  Wells Fargo; (8) tortious breach of implied covenant of good faith
7  and fair dealing against Wells Fargo; (9) breach of fiduciary duty
8  against Wells Fargo.

9      As noted above, defendants move to dismiss all but the breach
10  of contract claims.

11  I.  First Claim for Relief - O.R.S. 652.610(3)

12      In addition to the allegations recited above, plaintiffs
13  allege the following in support of their first claim for relief for
14  violation of O.R.S. 652.610(3) against WellsCap:  that the fully
15  vested stock options awarded under the LTIC Plan were part of their
16  total pecuniary compensation for services to WellsCap, that
17  WellsCap's interference with plaintiffs' exercise of their fully
18  vested stock options violated O.R.S. 652.610(3), and that they are
19  entitled to actual damages in the amount of at least $86,358.57 and
20  $34,565.39, respectively, as well as prejudgment interest and
21  attorney's fees.  Compl. at ¶¶ 10-16.

22      O.R.S. 652.610 is entitled "Itemized statement of amounts and
23  purposes of deductions required."  Subsections (1) and (2) address
24  the provision of an itemized statement of any "sum of money"
25  withheld from the "wages, salary or commission earned by an
26  employee[.]"  O.R.S. 652.610(1).  Subsection (3) provides that
27  "[n]o employer may withhold, deduct or divert any portion of an
28  employee's wages" unless certain requirements are met.  O.R.S.

652.610(3).

Defendants make three arguments in support of their Rule 12(b)(6) motion to dismiss this claim: (1) the statute does not address or prohibit "interference"; (2) the statute does not apply to stock options; and (3) no payment was due.

A.  Interference

Defendants note that the plain text of O.R.S. 652.610 generally addresses the payment of and deductions from wages, salary, or commissions. Defendants argue that the statute does not create a cause of action for an alleged "interference" with such payments or deductions. Defendants then argue that because plaintiffs have alleged an "interference," see Compl. at ¶ 13 ("WellsCap's interference with plaintiffs' exercise of their fully vested stock options constituted a violation of ORS 652.610(3)"), plaintiffs fail to state a claim. Furthermore, defendants note, under the facts pleaded in the Complaint, WellsCap did not control whether the options could be exercised because the alleged option agreements were with Wells Fargo.

Plaintiffs note that the actual text of the provision at issue reads that "[n]o employer may withhold, deduct or divert any portion of any employee's wages[.]" O.R.S. 652.610(3). Plaintiffs contend that the common understanding of the word "withhold" as in "withhold" payment, is "'to refrain from paying that which is due.'"  Pltf's Mem. at p. 5 (quoting Black's Law Dictionary 1602 (6th ed. 1990)).

Plaintiffs refer to paragraph 9 of their Complaint which is incorporated by reference into the first claim by paragraph 10.  In paragraph 9, plaintiffs allege that both WellsCap and Wells Fargo

5 - FINDINGS & RECOMMENDATION

1    have failed and refused plaintiffs' requests to exercise their
2    fully vested stock options, informing them that the options have
3    been cancelled. Compl. at ¶ 9.

4        Referring to facts outside of the Complaint, plaintiffs state
5    that the exercise of stock options in this case involves a series
6    of paper, electronic, and wire transactions which results in a
7    direct deposit of funds into plaintiffs' accounts. Thus,
8    plaintiffs argue, when WellsCap refused to permit plaintiffs to
9    exercise their options, it refused to permit or allow the deposit
10   of money into their accounts and accordingly, it withheld payment
11   of wages which were due. As a result, WellsCap's refusal violates
12   O.R.S. 652.610(3).

13       Finally, plaintiffs explain that they allege that WellsCap
14   "interfered" with their exercise of the stock options, because
15   until they are able to take discovery, they have no way of alleging
16   precisely how WellsCap stopped the exercise of plaintiffs' options.
17   They contend that they are entitled to discovery as to how WellsCap
18   accomplished the "withholding."

19       I agree with defendants that plaintiffs' factual assertions
20   about how the exercise of stock options in this case involves a
21   series of paper, electronic, and wire transactions resulting in a
22   direct deposit of funds into plaintiffs' accounts, should not be
23   considered because they are outside of the Complaint. Schneider v.
24   California Dep't of Corrections, 151 F.3d 1194, 1196 (9th Cir.
25   1998) (court may not consider new facts alleged in the plaintiff's
26   opposition).

27       However, even if I were to consider them, I reject plaintiffs'
28   argument that the exercise of the option is tantamount to a payment

6 - FINDINGS & RECOMMENDATION

1  of money to the employee.  At oral argument, plaintiffs' counsel
2  represented that most employees exercise their options under
3  paragraph 2(c) of the Agreements which allows for exercise by
4  delivering a "Notice of Exercise" and "irrevocable instructions to
5  a broker to promptly deliver to [Wells Fargo] the amount of the
6  exercise price and all applicable withholding taxes." Exhs. A & B
7  to Compl.  Plaintiffs' counsel explained that this allows an
8  employee to, essentially, exercise the option and sell the stock in
9  one transaction, or as counsel put it, to sell stock the employee
10  does not have.  As counsel explained, Wells Fargo sells the stock,
11  keeps the basis, and deposits the difference between the exercise
12  price and the basis into an account for the employee.

13      The Agreements create three separate methods for exercise, the
14  first two of which are:  (1) payment in cash, or (2) payment in
15  whole shares of Wells Fargo common stock, valued at their fair
16  market value.  Id.  These first two methods require the employee to
17  actually pay something for the shares of stock obtained in the
18  exercise.  The third method, described by counsel, is a "series" of
19  transactions which result in a deposit of cash into an employee's
20  account, but which, fundamentally, can best be understood as
21  beginning with a "payment" by the employee to later obtain the net
22  excess proceeds.  That is, while the initializing payment may be
23  fictitious, the employee clearly exercises the option only because
24  the exercise price of the shares is below the current fair market
25  value.  The employee starts the transaction by instructing a broker
26  to "buy" shares via the exercise, to sell them immediately, to pay
27  Wells Fargo for the exercise of the shares, and then deposit the
28  difference between the exercise price and the higher sale price, in

7 - FINDINGS & RECOMMENDATION

1   the employee's account.  While this results in a deposit of money
2   for the employee, it begins by the employee essentially borrowing
3   the money from Wells Fargo to "buy" the shares upon exercise,
4   selling them, and repaying Wells Fargo.  Thus, the method described
5   by counsel under paragraph 2(c) of the Agreements does not
6   eliminate the employee's purchase of the shares upon the employee's
7   exercise of the option; rather paragraph 2(c) simply collapses
8   several steps, the first one of which is a purchase, into a series
9   of near simultaneous transactions.

10      I reject plaintiffs' contention that when WellsCap allegedly
11  refused to permit plaintiffs to exercise their options, it refused
12  to permit or allow the deposit of money into their accounts and
13  thus, withheld payment of wages which were due.  The allegations do
14  not support a violation of O.R.S. 652.610(3) because the stock
15  options themselves create no payment obligation on behalf of the
16  grantor.

17      Additionally, as defendants note, plaintiffs fail to allege
18  that WellsCap, the defendant against whom this claim is brought,
19  has withheld or deducted anything.  Defendants correctly state that
20  plaintiffs do not allege that WellsCap had any control over the
21  stock option agreements between plaintiffs and Wells Fargo.  The
22  statute addresses withholding by the employer.  It does not address
23  situations of alleged "interference" by the employer with payment
24  allegedly owed by a third party.  I recommend that defendant's
25  motion be granted.

26      Finally, I see no benefit to allowing plaintiffs leave to
27  amend this claim. The plain language of the Agreements makes clear
28  that the exercise of the stock option requires an actual or

8 - FINDINGS & RECOMMENDATION

1  inchoate payment by the employee in order to obtain the shares
2  available in the option grant.   Whether the employee chooses to
3  obtain those shares, and what is done with them thereafter, is up
4  to the employee.    While in some cases, the employee may
5  simultaneously sell the shares, that is not required under the
6  terms of the Agreements.   In the end, that decision is completely
7  up to the employee and is out of the control of WellsCap or Wells
8  Fargo.   Because there are no circumstances under which the stock
9  option grant can be seen as creating an obligation of payment from
10  WellsCap, the employer, to plaintiffs, from which an allegedly
11  improper deduction under O.R.S. 652.610(3) could have been made, I
12  recommend that the claim be dismissed without leave to amend.

13      Because I recommend dismissal of the O.R.S. 652.610(3) claim
14  on this basis, I do not address defendants' alternative arguments
15  for dismissal of this claim.

16  II.   Second Claim for Relief - O.R.S. 652.140

17      This claim has two counts.    Count One is a declaratory
18  judgment claim to enforce O.R.S. 652.140 against WellsCap.    The
19  allegations in support of the claim are that plaintiffs' fully
20  vested stock options awarded under the LTIC Plan were part of the
21  total compensation contracted to be paid for plaintiffs' personal
22  services to their employer, WellsCap.   Compl. at ¶ 18.    Under
23  O.R.S. 652.140, all of plaintiffs' earned and unpaid wages became
24  due and payable as a matter of law within five days, excluding
25  Saturdays, Sundays, and holidays, after plaintiffs' resignations.
26  Id. at ¶ 19.   Plaintiffs contend they are entitled to a declaration
27  that WellsCap's interference with their exercise of their fully
28  vested stock options constituted a violation of O.R.S. 652.140, and

9 - FINDINGS & RECOMMENDATION

that they are further entitled to an order compelling WellsCap to
immediately execute plaintiffs' request to exercise their options.
Id. at ¶ 20.  They further contend that in the event that the cash
value of plaintiffs' stock options at the time of execution is less
than the cash value of the options as of November 6, 2006,
plaintiffs are entitled to judgment in an amount representing the
cash difference.  Id.  Plaintiffs also seek prejudgment interest
and attorney's fees.  Id. at ¶¶ 21, 22.

In Count Two, brought as an alternative to Count One,
plaintiffs reallege paragraphs 18, 19, and 22, but instead of
seeking a declaratory judgment, they contend that pursuant to
O.R.S. 652.140, they are entitled to payment of their earned and
unearned compensation in the amount of at least $86,358.57 and
$34,565.39, respectively.  Id. at ¶¶ 23, 24.

Plaintiffs do not specifically identify which subsection of
O.R.S. 652.140 they contend defendants violated, but it appears
they rely on subsection (2) which provides that if an employee does
not give forty-eight hours notice of quitting, "all wages earned
and unpaid at the time" of quitting are due and payable within five
days, excluding Saturdays, Sundays, and holidays, after the
employee has quit, or at the next regularly scheduled payday after
the employee has quit, whichever event first occurs.  O.R.S.
652.140(2).

Defendants argue that the claim must be dismissed because the
statute governs only wages earned and unpaid at the time of
quitting and here, the stock options were not earned and unpaid at
the time of quitting because plaintiffs had not yet satisfied the
condition precedent of delivering the notice of exercise.

10 - FINDINGS & RECOMMENDATION

1    Defendants cite State ex rel. Roberts v. Duco-Lam, Inc., 72
2  Or. App. 473, 696 P.2d 561 (1985), State ex rel. Roberts v. Public
3  Finance Co., 294 Or. 713, 662 P.2d 330 (1983), and Walker v.
4  American Optical Corp., 265 Or. 327, 509 P.2d 439 (1973), in
5  support of their argument, in addition to relying on the statutory
6  language.   The three cases suggest that an employer does not
7  violate O.R.S. 652.140 by waiting until the satisfaction of a
8  condition precedent to pay wages earned and unpaid at the time of
9  termination, even if the date such wages are paid is after the
10 O.R.S. 652.140 statutory time period.  Thus, in Duco-Lam, the court
11 held that wages earned, but not paid by virtue of an agreement
12 between the employees and the employer arising out of poor market
13 conditions,  were  not  due  and  payable  upon  the  employees'
14 termination, but only upon the later occurrence of the condition
15 precedent to repayment, which was increased profits generated by
16 improved market conditions.   Duco-Lam, 72 Or. App at 477-78, 696
17 P.2d at 563.

18   Similarly, in Walker, the court held that the plaintiff was
19 not entitled to penalty wages under O.R.S. 652.150 for failure to
20 timely pay wages upon termination, because even assuming bonus plan
21 payments were wages, the payments were not "due and owing" at the
22 time of termination when there was a failure of the employee to
23 satisfy the condition precedent to payment - being on the payroll
24 at the time the bonuses were distributed.  Walker, 265 Or. at 333,
25 509 P.2d at 442.

26   In Public Finance, the court held that the employee was not
27 entitled to collect vacation pay when the employment contract
28 provided  that  "vacation  entitlement  is  established  on  the

11 - FINDINGS & RECOMMENDATION

1  employee's anniversary date with the Company," and the employee was

2  terminated three days before his anniversary.  <u>Public Finance</u>, 294

3  Or. at 716, 662 P.2d at 332.

4      Defendants argue that the stock options in this case are not

5  payable until the time of exercise.  Because plaintiffs admit they

6  did not attempt to exercise their options until approximately one

7  month after their resignations, defendants contend that there is no

8  violation of O.R.S. 652.140(2).

9      Plaintiffs argue that WellsCap violated the statute because,

10 by virtue of plaintiffs' continuous employment with WellsCap from

11 November 25, 2003, through November 25, 2005, plaintiffs "earned"

12 the  right  to  exercise  two-thirds  of  their  covered  options.

13 Because, plaintiffs argue, their vested options were earned and

14 unpaid  at  the  time  of  resignation,  WellsCap  violated  O.R.S.

15 652.140(2).

16     I reject this argument.  First, this claim suffers from the

17 same problem as the O.R.S. 652.610(3) claim in that plaintiffs

18 bring the claim against WellsCap, their employer, but, any failure

19 to promptly pay any "earned and unpaid wages" at the time of

20 quitting is attributable to Wells Fargo, not to WellsCap.

21     Second, while plaintiffs' continuous employment for the two

22 years beginning November 23, 2005, resulted in two-thirds of the

23 shares subject to the grant being vested, or exercisable, all that

24 plaintiffs "earned," in plaintiffs' parlance, was the right to

25 exercise a stock option.  Even assuming for the purposes of this

26 discussion that a vested stock option is "wages" under O.R.S.

27 652.140, I agree with defendants that any payment of such "wages,"

28 was  subject  to  the  condition  precedent  of  plaintiffs  actually

12 - FINDINGS & RECOMMENDATION

1    exercising the option.  Because they failed to do so before or at
2    the time of termination, nothing was "unpaid" to them at that time.
3    Thus, any failure to pay them within the five days is not a
4    violation of O.R.S. 652.140(2).

5        Plaintiffs further contend that Oregon cases, and O.R.S.
6    652.120, recognize that employers and employees may agree to a
7    "deferred payment" of wages and under such circumstances, an
8    employer violates O.R.S. 652.140 by failing to pay wages which were
9    earned and unpaid at the time of resignation, at the agreed upon
10   "deferred payment" date.  O.R.S. 652.120 requires employers to
11   establish regular paydays.  Subsection (4) allows an employer to
12   enter into a written agreement, prior to the rendering of any
13   services, and mutually satisfactory with the employees, as to the
14   payment of wages at a future date.

15       Plaintiffs rely on Crofoot v. Columbia-Willamette Air
16   Pollution Auth., 31 Or. App. 903, 571 P.2d 1266 (1977), and Miller
17   v. CC Meisel Co., Inc., 183 Or. App. 148, 51 P.3d 650 (2002). In
18   Miller, the plaintiff prevailed on a contract theory for monies he
19   alleged he was owed.  The trial court concluded that the monies
20   owed under the contract were "wages" within the meaning of O.R.S.
21   Chapter 652 and entered judgment for the plaintiff on the contract
22   claim and a parallel claim for "unpaid compensation."  Id. at 153,
23   51 P.3d at 655.  The court then awarded the plaintiff attorney's
24   fees under O.R.S. 656.200 for the "unpaid compensation" claim.  Id.

25       One of the defendant's arguments on appeal was that under the
26   "unpaid compensation" claim, no wages were capable of calculation
27   at the time of termination because the plaintiff himself had to
28   complete certain financial statements before the defendant's value

13 - FINDINGS & RECOMMENDATION

could be accurately assessed and the plaintiff had failed to accomplish this task.  The appeals court rejected this argument. It explained that because the plaintiff had given the defendant eight or nine months' notice of his retirement, the defendant had had plenty of time to calculate the sum due.  Id. at 161, 51 P.3d at 659.  Moreover, the court explained, even if the plaintiff agreed to postpone the payment of his compensation for a certain period of time while the parties negotiated the sum due, the wages became payable upon demand when the negotiations failed.  Id.

In Crofoot, both the trial court and the Court of Appeals concluded that the plaintiff was entitled to four weeks of severance pay.  The evidence showed that while the plaintiff would ordinarily have been due the severance pay upon his June 30, 1973 termination, he wrote to the employer and asked for payment to be delayed because he hoped to continue his employment in government and then transfer his benefits to another government agency.  31 Or. App. at 910, 571 P.2d at 1270.  However, the plaintiff was unable to secure government employment and requested his severance pay on February 6, 1974.  The employer failed to pay.

The trial court concluded that the severance pay was due on June 30, 1973, the date of termination, and that the employer's failure to pay it then was willful, rendering it liable for penalty wages under O.R.S. 652.150.  On appeal, the employer argued that it was not liable for the penalty wages because its action was not willful, given the plaintiff's waiver of immediate payment.

The Court of Appeals partially rejected the defendant's argument.  Id. at 911, 571 P.2d at 1270-71.  The court agreed that given the plaintiff's request to delay payment, the severance pay

14 - FINDINGS & RECOMMENDATION

1   was not immediately payable on June 30, 1973, the date of

2   termination. Id. But, the court held that the initial waiver did

3   not act as a waiver of the employer's duty to make immediate

4   payment when the plaintiff made his demand for payment in February

5   1974. Id.

6       I agree with plaintiffs that Miller and Crofoot recognize that

7   the parties can mutually agree to extend the time for payment of

8   wages earned and unpaid at the time of termination, beyond the time

9   required in the statute. The problem for plaintiffs here is that

10  unlike the severance pay in Crofoot, which was clearly owed to the

11  employee and which the employee expressly desired to receive, and

12  unlike the monies owed to the plaintiff in Miller, which were also

13  clearly owed to the employee and which the employee expressly

14  desired to receive, a stock option, even one that is vested, is no

15  more than an option to purchase stock.

16      Unlike the severance pay at issue in Crofoot, or the monies

17  owed upon retirement in Miller, plaintiffs here could have

18  exercised the stock options at issue in this case any time after

19  November 25, 2005. Thus, plaintiffs themselves could have

20  triggered a "payment" even before their resignations. Also, unlike

21  the severance pay at issue in Crofoot, and the monies owed in

22  Miller, plaintiffs here could choose never to exercise the stock

23  options. This is especially true if the selling price of the stock

24  was below the exercise price. Thus, unlike the employer in

25  Crofoot, which agreed with plaintiff to simply defer a payment to

26  which plaintiff was unconditionally entitled, defendants here had

27  no knowledge that any "payments" would be due and payable, ever.

28  Miller and Crofoot address situations where an employee has an

15 - FINDINGS & RECOMMENDATION

1    enforceable right to payment at the time of termination and agrees
2    to delay that payment.  In contrast, plaintiffs in the instant case
3    did not agree at the time of resignation, to an exercise date one
4    month later.  There was no "mutual agreement" between plaintiffs
5    and defendants in this case, to defer anything which had actually
6    accrued to plaintiffs.

7         The more appropriate description for the stock options is that
8    they were earned, or became vested, by virtue of plaintiffs'
9    continuous employment from November 23, 2003, to November 23, 2005,
10   and were "delivered."  That is, the option to purchase two-thirds
11   of the shares in the grant ripened, but because exercise of those
12   options was completely in the employees' control, there was no
13   obligation to "pay," either at the time of termination or at a
14   mutually agreed upon deferred time, until the actual exercise.
15   Under these circumstances, the facts alleged here do not state a
16   claim under O.R.S. 652.140.  Given my conclusion, I further
17   recommend that amendment would be futile.

18        Alternatively, plaintiffs argue that even if I accept
19   defendants' argument that O.R.S. 652.140 does not apply to this
20   case, plaintiffs are nonetheless entitled to seek the relief sought
21   in the prayer for this claim.  The prayer for this claim seeks (1)
22   a decree ordering defendants to immediately execute plaintiff's
23   request to exercise their stock options and for judgment in the
24   amount of any deficiency, or, judgment in the amount of $86,358.57
25   for Marshall, and $34,565.39 for Curdy; (2) prejudgment interest;
26   and (3) attorney's fees pursuant to O.R.S. 652.200(2).

27        Plaintiffs argue that none of the relief sought in this prayer
28   requires a determination that O.R.S. 652.140 was violated.

16 - FINDINGS & RECOMMENDATION

1  Plaintiffs argue that based solely on their rights under the
2  Agreements, and entirely independent of O.R.S. 652.140, they are
3  entitled to seek a decree ordering WellsCap to immediately execute
4  their requests to exercise their options and that they need not
5  prove that O.R.S. 652.140 was violated to be entitled to an award
6  for unpaid wages.  Moreover, they argue that they are still
7  entitled to seek attorney's fees under O.R.S. 652.200(2) which
8  applies to any action for the collection of wages if the wages were
9  not paid for a period of forty-eight hours after they became due
10 and payable.

11     I reject this argument.  The prayer does not stand on its own.
12 Plaintiffs must assert a right to relief in conjunction with the
13 claim that they contend entitles them to obtain that relief.  I
14 recommend that while this claim should be dismissed, leave to amend
15 should be given to reassert the relief sought in the prayer for
16 this claim, as relief sought on another pending claim.  A deadline
17 for such an amendment will be discussed in a telephone scheduling
18 conference which my Courtroom Deputy will arrange.

19 III.  Third Claim for Relief - O.R.S. 652.150

20     O.R.S. 652.150 allows for penalty wages for a willful
21 violation of O.R.S. 652.140.  Because I recommend that the O.R.S.
22 652.140 claim be dismissed, I recommend that the O.R.S. 652.150
23 claim be dismissed as well.

24 IV.  Fifth and Seventh Claims for Relief - Breach of the Implied
       Covenant of Good Faith & Fair Dealing
25
26     The fifth claim is asserted against WellsCap.  Plaintiffs
   allege that WellsCap's failure to facilitate payment and its active
27
   interference with plaintiffs' exercise of their fully vested stock
28

17 - FINDINGS & RECOMMENDATION

1   options breached the implied covenant of good faith and fair
2   dealing inherent in the contractual relationship between plaintiffs
3   and WellsCap.  Compl. at ¶ 38.  Plaintiffs allege that they are
4   entitled to compensatory damages of at least $86,358.57 (Marshall),
5   and $34,565.39 (Curdy).  Id. at ¶ 39.  They also seek prejudgment
6   interest from the date they submitted the stock option exercise
7   form, to the date of judgment.  Id. at ¶ 40.

8       The Seventh Claim is against Wells Fargo.  Plaintiffs allege
9   that the actions of Wells Fargo in refusing plaintiffs' request to
10  exercise their fully vested stock options and purportedly canceling
11  plaintiffs' stock options, breached the covenant of good faith and
12  fair dealing inherent in the Agreement.  Compl. at ¶ 46.
13  Plaintiffs seek compensatory damages in the amounts of, at least,
14  $86,358.57 (Marshall), and $34,565.39 (Curdy).  Id. at ¶ 47.  They
15  also seek prejudgment interest at the legal rate from the date they
16  submitted their exercise form to the date of judgment.  Id. at ¶
17  48.

18      There is an implied obligation of good faith in the
19  performance and enforcement of every contract.  Zygar v. Johnson,
20  169 Or. App. 638, 645, 10 P.3d 326, 330 (2000) ("Every contract
21  contains an implied covenant of good faith and fair dealing, one
22  that serves to protect objectively reasonable contractual
23  expectations of the parties.").  Claims alleging breach of the
24  contractual duty of good faith may be pursued independently of a
25  claim for breach of an express contract term.  McKenzie v. Pacific
26  Health & Life Ins. Co., 118 Or. App. 377, 381, 847 P.2d 879, 881
27  (1993).

28      Although the implied duty of good faith and fair dealing
18 - FINDINGS & RECOMMENDATION

1   exists even in contracts without discretionary provisions, _id._, it

2   cannot contradict an express contractual term, nor otherwise

3   provide a remedy for an unpleasantly motivated act that is

4   permitted expressly by the contract.  _Zygar_, 169 Or. App. at 645,

5   10 P.3d at 330.   To sustain a claim, a plaintiff must assert

6   conduct by the defendant that violated the plaintiff's objectively

7   reasonable contractual expectations.   _Uptown Heights Assoc. Ltd_

8   _P'ship v. Seafirst Corp._, 320 Or. 638, 645, 891 P.2d 639, 643

9   (1995).  Conduct consistent with the terms of the contract cannot

10  serve as the basis of a claim of violation of the duty of good

11  faith.

12       "[T]he terms of a contract help serve to define the

13  objectively reasonable expectations of the parties [which the

14  implied duty of good faith protects].   As a corollary to that

15  proposition, a party invoking an express contractual right does

16  not, merely by doing so, violate the duty of good faith."  _Zygar_,

17  169 Or. App. at 645, 10 P.3d at 330 (internal quotation omitted).

18       I recommend that these claims be dismissed.  First, as to the

19  claim against WellsCap, I note that the Complaint does not clearly

20  aver the existence of a contract between plaintiffs and WellsCap.

21  The LTIC Plan and the Agreements are contracts between plaintiffs

22  and Wells Fargo.   The background facts assert no contractual

23  relationship between WellsCap and plaintiffs.  Compl. at ¶¶ 1-9.

24  In support of the O.R.S. 652.610(3) claim against WellsCap,

25  plaintiffs allege that their fully vested stock options awarded

26  under the Agreements were part of their total pecuniary

27  compensation for services to their employer, WellsCap.  _Id._ at ¶

28  11.  In support of their fourth claim, a claim of breach of

19 - FINDINGS & RECOMMENDATION

contract against WellsCap, they allege that their fully vested
stock options awarded under the Agreements were a material part of
the compensation contracted for plaintiffs' personal services to
WellsCap. Id. at ¶ 32. Even assuming these allegations show the
existence of a contract between WellsCap and plaintiffs, they are
not incorporated by reference into the allegations supporting the
fifth claim alleging that WellsCap breached the contractual duty of
good faith and faith and fair dealing. As should be clear from the
standards outlined above, without a contract, there is no implied
duty of good faith. Thus, the claim against WellsCap should be
dismissed for this reason alone.

The more fundamental problem with these claims is that
defendants' cancellation of plaintiffs' vested stock options was
either permitted under the Agreements and the LTIC Plan, or it was
not. The written documents, explained in more detail below,
expressly address the right to exercise options upon termination
from employment. Here, defendants' conduct was either consistent
with the express terms of the documents, in which case it was
permissible, or it was not, in which case the appropriate claim is
one for breach of contract. If plaintiffs' interpretation of the
documents is correct, they had three months after a voluntary
resignation in which to exercise their stock options. If
defendants' interpretation of the documents is correct, the options
were not exercisable after they resigned. The issue is which
interpretation governs the parties' relationship, not whether a
contract was performed in good faith.

The Agreement for each plaintiff provides that if the employee
leaves employment for reasons other than death, permanent

20 - FINDINGS & RECOMMENDATION

1  disability, retirement, or discharge for cause, the employee may
2  still exercise any part of the option which was exercisable on the
3  date of termination, any time within three months after the date of
4  termination.  Exhs. A & B to Compl. at ¶ 3.

5      The Agreements also state, however, that the stock "[o]ption
6  is granted subject in all respect to the terms of the Company's
7  Long-Term Incentive Compensation Plan (the 'Plan')."  Exhs. A & B
8  to Compl. at ¶ 1.  The Agreements expressly provide that they are
9  subject to the provisions of the LTIC Plan.  Id. at ¶ 9.  They
10 further expressly state that "[i]f the Plan and this Agreement are
11 inconsistent, provisions of the Plan will govern.  Interpretations
12 of the Plan and this Agreement by the Committee are binding on you
13 and the Company."  Id.

14     The LTIC Plan contains a provision which appears to contradict
15 the termination provisions of the Agreements.  The LTIC Plan has a
16 section  governing  the  exercise  of  options  upon  the  death,
17 disability, or retirement of an employee.  Exh. 1 to Defts' Mtn at
18 ¶ 10.2.  It has a separate paragraph for termination of employment
19 for reasons other than death, disability, or retirement.  Id. at ¶
20 10.3.  This provision states that "[e]xcept as otherwise determined
21 by the Committee, in the event a Participant ceases to be an
22 Employee for any reason other than his death, permanent disability
23 or Retirement, all rights of the Participant under this Plan shall
24 immediately terminate without notice of any kind."  Id.

25     The Agreement terms are at odds with the language in the LTIC
26 Plan regarding the continued right to exercise vested options upon
27 termination  other  than  for  death,  disability,  or  retirement.
28 Because the Agreements provide that the LTIC Plan controls in the

21 - FINDINGS & RECOMMENDATION

1  event of an inconsistency, defendants contend that there is no

2  breach of an implied duty of good faith.

3      Plaintiffs argue that the Agreements are not inconsistent with

4  the LTIC Plan.  Plaintiffs point to paragraph three of the LTIC

5  Plan, labeled "Administration."  Exh. 1 to Defts' Mtn. at ¶ 3.  It

6  provides, in pertinent part, that "[t]he Plan shall be administered

7  by the Committee.  Subject to the provisions of the Plan, the

8  Committee shall have exclusive power to determine when and to whom

9  Awards will be granted, the form of each Award, the amount of each

10 Award, and any other terms or conditions of each Award."  Id.  The

11 LTIC Plan defines "Committee" as a "committee selected by the Board

12 and consisting of two or more members of the Board."   Id. at ¶

13 2.1(d).

14     In paragraph 10.1, the LTIC Plan provides that an award of an

15 option is subject to

16         such terms, conditions and restrictions as the Committee
17         shall determine, subject to the provisions of this Plan,
           including the following:

18         . . .

19             (c) Exercise Term.  A statement of the Term of each
20             Option granted as established by the Committee,
               provided that no Option shall be exercisable after
21             ten years from the date of grant.

22 Id. at ¶ 10.1.

23     Plaintiffs note that paragraph 10.3, relied on by defendants

   and providing that exercise rights immediately terminate upon
24
   cessation of employment for any reason other than death, permanent
25
   disability, or retirement, is preceded by the phrase, "[e]xcept as
26
   otherwise determined by the Committee."  Id. at ¶ 10.3.  Plaintiffs
27
   contend that by issuing the Agreements with the express provision
28

22 - FINDINGS & RECOMMENDATION

that plaintiffs' vested options were to remain exercisable for three months after a voluntary resignation, the Committee determined the terms of their exercise in full compliance with the LTIC Plan, and thus, construed this way, there is no inconsistency and the three-month post-termination period of exercise applies.

While highlighting this contract interpretation dispute is necessary to demonstrate why the facts do not support a breach of an implied duty of good faith claim, resolving the contract interpretation dispute is not required here. The point is that either defendants' interpretation or plaintiffs' interpretation accurately reflects the terms of the exercise period. In either case, it is simply conduct consistent with an express contract term, or conduct inconsistent with such a term, that is at issue. There is no basis for a breach of a covenant of good faith claim. I recommend that these two claims be dismissed with prejudice.

V.    Eighth and Ninth Claims for Relief - Tortious Breach of the
      Duty of Good Faith and Breach of Fiduciary Duty

These claims are both brought against Wells Fargo. In the eighth claim, for tortious breach of the implied covenant of good faith and fair dealing, plaintiffs allege that by virtue of its position of trust and reservation of discretion under the LTIC Plan and the Agreement, Wells Fargo stood in a position of a special relationship with plaintiffs. Compl. at ¶ 50. Plaintiffs further allege that Wells Fargo's action in refusing plaintiffs' request to exercise their fully vested stock options and purportedly canceling the options constituted a breach of the covenant of good faith and fair dealing inherent in the Agreement. Id. at ¶ 51. Plaintiffs seek compensatory damages, prejudgment interest, and punitive

23 - FINDINGS & RECOMMENDATION

1  damages.  Id. at ¶¶ 52-54.

2       In the ninth claim, breach of fiduciary duty, plaintiffs
3  allege that by virtue of its position of trust and reservation of
4  discretion under the LTIC Plan and the Agreement, Wells Fargo owed
5  plaintiffs a fiduciary duty of loyalty in administering the LTIC
6  Plan and Agreement.  Id. at ¶ 56.  Plaintiffs contend that by
7  refusing to permit plaintiffs to exercise the options, and
8  purportedly canceling them, Wells Fargo breached its fiduciary duty
9  of loyalty in one or more of the following ways:  (1) failing to
10 act in good faith; (2) failing to investigate in good faith the
11 claim of Cooper and WellsCap that plaintiffs had been discharged
12 for cause; (3) failing to act for plaintiffs' best interest; and
13 (4) acting in its own financial self interest and that of its
14 subsidiary to the detriment of plaintiffs.  Id. at ¶ 57.  As with
15 the eighth claim, plaintiffs seek compensatory damages, prejudgment
16 interest, and punitive damages on the ninth claim as well.  Id. at
17 ¶¶ 58-60.

18      Defendants move to dismiss these claims on the basis that
19 there is no special relationship between the parties.  Defendants
20 argue that while plaintiffs have pleaded the existence of a
21 "special relationship" in a conclusory fashion, plaintiffs fail to
22 plead facts supporting the type of special relationship that Oregon
23 law requires to support either of these two claims.

24      As explained by the Oregon Court of Appeals in a 1997 case,

25      [u]nder either theory breach of fiduciary duty or the
        tortious breach of duty of good faith and fair dealing,
26      plaintiff was required to present evidence that a special
        relationship or fiduciary-type relationship existed
27      between the parties that was independent of the duties
        under the [contract].
28

24 - FINDINGS & RECOMMENDATION

Bennett v. Farmers Ins. Co., 150 Or. App. 63, 79, 945 P.2d 595, 604 (1997), aff'd in part, rev'd in part on other grounds, 332 Or. 138, 26 P.3d 785 (2001).

In Conway v. Pacific University, the Oregon Supreme Court addressed the issue of a "special relationship" giving rise to tort liability as opposed to contract liability. 324 Or. 231, 924 P.2d 818 (1996). The court listed several types of relationships it had previously found carried a heightened duty of care. Id. at 239-40, 924 P.2d at 823-24. It then stated that

> [a]nother way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a special responsibility toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interest. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.
>
> This special relationship exists in situations . . . in which one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party.

Id. at 240-41, 924 P.2d at 824; see also Schukart v. State Farm Mut. Auto. Ins. Co., No. CV-04-6242-AA, 2006 WL 456260, at *4 (D. Or. Feb. 22, 2006) (citing Bennett and Conway for proposition that under the theory of tortious breach of duty of good faith and fair dealing, plaintiff must present evidence that a special relationship or fiduciary-type relationship existed between the

25 - FINDINGS & RECOMMENDATION

1  parties that was independent of their contractual relationship).

2      In response to the motion, plaintiffs rely on two arguments.
3  First, they contend that the stock option grant created by the LTIC
4  Plan and the Agreements is, in essence, a trust, and that Oregon
5  courts recognize that a trustee-beneficiary relationship is a
6  "special relationship" for purposes of a tortious bad faith or
7  breach of fiduciary duty claim.  Second, they contend that the
8  stock option grant should be viewed as similar to other benefit
9  plans provided by Wells Fargo, such as a 401(k) plan, which create
10 a fiduciary relationship between Wells Fargo and the employee.
11 Plaintiffs argue that there is no reason to distinguish the stock
12 option grant from other benefit programs and it should be treated
13 as similarly providing a "fiduciary type" relationship.

14      I reject these arguments.  As to the trust theory, while I
15 agree with plaintiffs that Oregon recognizes a trustee-beneficiary
16 relationship as a "special relationship," e.g., SFG Income Fund, LP
17 v. May, 189 Or. App. 269, 279, 75 P.3d 470, 475 (2003) (trustees
18 owe a heightened duty to act in the best interests of their
19 beneficiaries as well as a duty to act in good faith), I do not
20 view the allegations and the documents governing the stock option
21 grants in this case as creating a trust.  First, plaintiffs cite no
22 Oregon, or other, cases holding that a stock option agreement
23 creates a beneficiary-trustee relationship.

24      Second, Oregon courts generally describe a trust as "'an
25 equitable obligation, either express or implied, resting upon a
26 person by reason of a confidence reposed in him to apply or deal
27 with property for the benefit of some other person, or for the
28 benefit of himself and another or others, according to such

26 - FINDINGS & RECOMMENDATION

confidence.'"   Lozano v. Summit Prairie Cattlemens Ass'n, 155 Or. App. 32, 37, 963 P.2d 92, 95 (1998) (quoting Templeton v. Bockler, 73 Or. 494, 506, 144 P. 405 (1914)).   Notably, "[a] mere contractual obligation, including a contractual promise to convey property, does not create a trust."   Id. at 38, 963 P.2d at 96.

Here, the facts alleged do not support plaintiffs' contention that Wells Fargo held any property for another's benefit.   No part of the Agreement or the LTIC Plan suggests that Wells Fargo had any obligation to do anything in particular with the shares of stock that it made available to employees.    No facts show that Wells Fargo had any express duty to act in plaintiffs' interests. Rather, the LTIC Plan expressly provides that its primary purpose is to produce a superior return to stockholders.   Exh. 1 to Defts' Mtn at ¶ 1.

Third, under the Restatement of Trusts, which Oregon courts frequently rely on, e.g., Kidney Ass'n of Or., Inc. v. Ferguson, 315 Or. 135, 144, 843 P.2d 442, 447 (1992), "an interest subject to a condition subsequent is not, because of the condition, held in trust."   Restatement of Trusts (Second) § 11 (1959).   As noted by one court, "stock option agreements are contracts subject to a contingency[.]"   DeNadai v. Preferred Capital Mkts., 272 B.R. 21, 34 (Bankr. D. Mass. 2001).   The stock option grant in this case is subject to several contingencies, including being employed for a certain period of time, not being discharged for cause, and timely exercise of the option.   Given these "conditions subsequent," the stock option documents create no trustee-beneficiary relationship.

Similarly, I conclude that the stock option agreement does not create a "fiduciary type" relationship.    At oral argument,

27 - FINDINGS & RECOMMENDATION

plaintiffs' counsel contended that there was no distinction between Wells Fargo's administration of its 401 plan, and its administration of this LTIC Plan, and thus, the Court should find a "fiduciary type" relationship inherent in the administration of the LTIC Plan similar to the one existing in the administration of the 401 plan.

Differences in the nature of the benefits offered by a 401 plan and stock option plan counsel against finding a fiduciary duty in the latter simply because one exists in the former. Under a typical 401 plan, a certain portion of the employee's earned and accrued wages are diverted to a fund, managed by the employer or the employer's designee. Some employers also make "matching" contributions to the fund. Some employers require an employee to be employed a certain number of years before that matching contribution is irrevocable. Nonetheless, the contribution made by the employee him or herself out of the employee's accrued wages, represents a transfer of actual assets from the employee to the fund.

In contrast, the stock option agreement creates only a right for the employee to act. It does nothing more. If the option has vested by virtue of the employee's continuous employment for the designated period of time, there still is no asset to manage or protect until, and most importantly unless, the employee exercises the option. Under the LTIC Plan and the Agreements, there is no creation or transfer of an asset for Wells Fargo to manage or administer. Because of the contingency of exercise, the "asset" is nonexistent.

Thus, unlike a 401 plan, the LTIC Plan contains no provision

28 - FINDINGS & RECOMMENDATION

imposing any obligation on Wells Fargo to administer assets, or otherwise act on plaintiffs' behalf. Plaintiffs give no assets to the Committee to administer or manage. The stock option agreements are distinguishable from 401 and other benefit plans.

Notably, "parties to a contract are in a 'special relationship' imposing a heightened duty of care and thereby creating potential tort liability when one party delegates to the other the authority to make important decisions with the understanding that the authority is to be exercised on behalf of and for the benefit of the authorizer." <u>Jones v. Emerald Pac. Homes, Inc.</u>, 188 Or. App. 471, 478, 71 P.3d 574, 579 (2003). Here, plaintiffs do not, under the stock option agreements, delegate any authority to defendant to make any decision. Thus, the relationship does not qualify as "special" to support a tort claim.

CONCLUSION

I recommend that defendants' motion to dismiss (#6) plaintiffs' first, second, third, fifth, seventh, eighth, and ninth claims, be granted, and that the dismissal be with prejudice for all claims.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due December 13, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

/ / /

/ / /

/ / /

/ / /

29 - FINDINGS & RECOMMENDATION

If objections are filed, a response to the objections is due December 27, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this  28th   day of November      , 2007.




  /s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

30 - FINDINGS & RECOMMENDATION